NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

25-P-694

ADOPTION OF WANIDA.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

Following a review and redetermination trial, a Juvenile Court judge adjudicated the mother currently unfit to further the welfare and best interests of the child, found that said unfitness is likely to continue into the indefinite future, awarded permanent custody of the child to the Department of Children and Families (department), and terminated the mother's parental rights.  The putative father died several months before the birth of the child.  The mother filed unsuccessful motions for relief from judgment.  The mother appeals from the judgment and the postjudgment motions, and we affirm.

Background.  Born substance exposed to methadone in 2019, the child (age four at trial), was diagnosed with neonatal

_____

[1] The child's name is a pseudonym.

abstinence syndrome.  The mother knowingly used fentanyl and had a positive screen for benzodiazepines while pregnant with the child.  The child remained hospitalized for almost three weeks following her birth, so that she could be weaned off methadone. The substance-exposed birth resulted in a report filed pursuant to G. L. c. 119, § 51A (51A report), and a subsequent investigation supported the allegation of neglect.  The child had a condition that required follow-up care by a cardiologist and an ophthalmologist.

About four months after the first 51A report, a second 51A report, also substantiated, alleged medical neglect of the child after the mother missed at least six separate medical appointments for the child and failed to reschedule.  Despite the involvement of the department, a third 51A report followed about ten months later, again alleging medical neglect of the child due to the child being six weeks behind in medical appointments as well as immunizations.

After the third 51A report, the department remained significantly involved with the mother and the child and conducted regular home visits and offered referrals for services.  The child experienced speech and developmental delays and required early intervention services which the mother attended for three months before she stopped attending and

2

became unreachable by clinicians for six months through the child's third birthday.

The mother suffered from significant mental health conditions (including major depressive disorder, posttraumatic stress disorder, anxiety, and attention deficit and hyperactivity disorder) and substance use issues. The mother often canceled scheduled home visits, and a department social worker frequently found the home dirty and cluttered and in complete disarray. The social worker noted that the child did not make eye contact, lacked age-appropriate socialization, mainly watched television, always had a full diaper, and developed a significant rash. The department made several referrals for early intervention services, dentists, mental health services, and medical providers for both the child and mother, but the mother rarely followed through. Noting that the child did not have an appropriate bed, the department ordered a toddler bed for the child, but the mother was unavailable for delivery on two occasions. The mother continued to use fentanyl, marijuana, and other non-prescribed substances.

In June 2022, the department petitioned for and received custody of the child, based on the mother's continued substance use, non-compliance with services for substance use and mental health, and failure to meet the child's needs. Following

3

removal, the mother missed visits and arrived late on seventy-five percent of the visits she did attend, leaving the child waiting. The mother also disregarded rules that were put in place for the child's health and well-being.

In April 2023, the mother stipulated to her unfitness, and the department obtained permanent custody of the child. One year later, in July 2024, following a review and redetermination trial over five non-consecutive days starting in May 2024, with seven witnesses testifying and ninety-nine exhibits being admitted into evidence, the judge found the mother unfit to parent the child and that it was in the child's best interest to terminate the mother's parental rights. The judge also concluded that the mother's visitation with the child would not be in the child's best interest.

In January 2025, the mother filed motions seeking a new trial and post-termination visitation. She claimed that counsel was ineffective and changed circumstances required modification of the visitation provisions in the judgment. A second judge denied the motions in a memorandum of decision.

Discussion. 1. Effective assistance of counsel. "A parent facing termination of parental rights is entitled to the effective assistance of counsel." Adoption of Ulrich, 94 Mass. App. Ct. 668, 672 (2019). We examine counsel's conduct "under

4

the standards applicable to judging the effectiveness of counsel's assistance in criminal cases." Adoption of Yvette (No. 1), 71 Mass. App. Ct. 327, 345 (2008). That examination requires "a discerning examination and appraisal of the specific circumstances of the given case to see whether there has been serious incompetency, inefficiency, or inattention of counsel -- behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer." Commonwealth v. Saferian, 366 Mass. 89, 96 (1974). If such an error has been made, we then must examine "whether it has likely deprived the [client] of an otherwise available, substantial ground of defence." Id. "Where a strategic choice is at issue, '[a]n attorney's tactical decision amounts to ineffective assistance of counsel only if it was manifestly unreasonable when made.'" Adoption of Yvette, 71 Mass. App. Ct. 327, 345 (2008), quoting Commonwealth v. Martin, 427 Mass. 816, 822 (1998).

We disagree with the mother's contention that counsel rendered ineffective assistance by failing to contest evidence from a department report indicating a positive drug screen for fentanyl in March 2023. The mother contends that the positive screen, briefly referenced by the judge in extensive findings, should not have been admitted and is otherwise contradicted by a two-page Drug Monitoring Report (DMR) that was never offered by

5

the mother's counsel and showed a negative result for fentanyl and a positive result for norfentanyl.  The main problem with this claim is that the second page of the DMR explains in a note that "Norfentanyl detected is consistent with the use of the drug Fentanyl."  Thus, the DMR, when read in its entirety, would have been consistent with the department's case and the judge's findings.  As such, we discern no error by counsel.

Likewise, the mother's position on appeal -- that counsel should have sought to exclude other evidence connected with drug screens, should have presented an expert to interpret the evidence, and should have presented witnesses on the sobriety issue -- is inconsistent with the standards for evaluating effective assistance and equally inconsistent with the strategy pursued at trial.  "[W]e are not impressed with . . . a checklist of . . . motions that could theoretically have been made" in hindsight.  Saferian, 366 Mass. at 99.  Indeed, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight."  Strickland v. Washington, 466 U.S. 668, 689 (1984). Even the best "attorneys would not [represent] a particular client in the same way."  Id.

Here, the mother's testimony and theory of the case never contested her long-standing problem with a variety of drugs as

well as her drug use that persisted during the care and protection case. She testified that she suffered from an "Opioid Use Disorder," and began taking prescribed opioids for pain management in 2012 when she was twenty-four. After a period of sobriety, at twenty-seven, she turned to heroin for several years, thereafter treated with methadone, and relapsed on fentanyl in 2019 when she found the father of the child deceased. In the spring of 2022 (with the care and protection case pending), she continued to use marijuana and fentanyl and tested positive for fentanyl. In August and September 2022, she tested positive for fentanyl, in October 2022 tested positive for norfentanyl, and in February 2023 tested positive for alprazolam. She tested positive for marijuana one month before testifying but disclaimed more recent use. She finally achieved sobriety from opiates "purely by abstinence." In her closing argument, counsel emphasized this terrible struggle with addiction and how the mother has "progressed exponentially" to become sober to give her child "a loving mother who would do anything in her power to get her back." Far from showing a lapse by counsel, the record shows that counsel strategically used this evidence hoping to show the enormous, commendable strides made by the mother in her lengthy struggle to overcome

7

addictions.  In short, counsel "played the few cards [she] had."
Saferian, 366 Mass. at 93.

We also note that the mother's current focus on substance use overlooks other significant factors considered by the judge. For example, the mother repeatedly rescheduled home visits by the department, maintained an unclean home with mice droppings throughout and "no clear paths" to walk through clutter, failed to avail herself of community supports, never worked with a psychiatrist during the proceedings, did not complete a medication evaluation regarding mental health, arrived late to child visits about seventy-five percent of the time, and neglected the child's hygiene and medical and developmental needs.  Given this evidence of the complex dynamic and neglect in the home, any alleged missteps by counsel on the substance use issue would not have likely deprived the mother "of an otherwise available, substantial ground of defence."  Saferian, 366 Mass. at 96.

2.  Visitation.  A motion for relief from judgment "requires a showing of 'extraordinary circumstances'" (citation omitted).  Adoption of Yvonne, 99 Mass. App. Ct. 574, 584 (2021).  A decision denying a motion for relief from judgment "is entitled to great deference, and 'a judge's decision [to deny such a motion] will not be overturned, except upon a

showing of a clear abuse of discretion.'" Adoption of Franklin, 99 Mass. App. Ct. 787, 805 (2021), quoting Adoption of Yvonne, 99 Mass. App. Ct. at 582. We discern no abuse of discretion.

As previously noted, the trial judge concluded that the mother's visitation with the child would not be in the child's best interest. In her post-judgment motion, the mother argued that visitation was warranted because the child was no longer placed in a pre-adoptive home. The second judge denied the motion and concluded that the mother "has failed to present any circumstance so extraordinary as to warrant relief and the absence of post-termination visitation remains in [the child's] best interest." The second judge further concluded that allowing visitation "would jeopardize [the child's] future placements because Mother has shown an inability to follow visitation rules and has consistently interfered with [the child's] attempts at successful placement."

The record shows that the second judge thoughtfully considered the mother's arguments and distinguished this case from Adoption of Franklin. In Adoption of Franklin, 99 Mass. App. Ct. at 806, the child's "imminent" adoption had been disrupted, the child had no parent-child relationship available in department custody, and the father had a bond with the child. None of those factors are present here where the child had only

9

been placed with the pre-adoptive parents during the trial, and there was "limited evidence that readily points to a significant bond" between the mother and the child.  The second judge was not required to credit the mother's contentions and was not required to conduct an evidentiary hearing.  See Adoption of Gillian, 63 Mass. App. Ct. 398, 410 (2005).

Finally, we note that the second judge erred by prohibiting the mother's counsel from sharing information obtained at the hearing on the post-judgment motions with the mother on the ground that the mother supposedly lacked standing.  "[W]here a parent is challenging a decree entered following a best interests trial, the parent retains standing to challenge the decree, whether on appeal or through an appropriate posttrial motion in the trial court, so long as that litigation remains live."  Adoption of Franklin, 99 Mass. App. Ct. at 805.  Despite this error, we discern no prejudice to the mother in advancing her arguments on appeal.  In view of the motion judge's thoughtful and well-reasoned posttrial orders, we discern

no reason, as proposed by the mother, that the case should be reassigned going forward.

          <u>Decree affirmed</u>.

          <u>Orders denying motions for relief from judgment affirmed</u>.

          By the Court (Rubin, Grant & Hodgens, JJ.[2]),

          Clerk

Entered:  May 4, 2026.

---

[2] The panelists are listed in order of seniority.